HENRY SOLOMON ADSM. BENJAMIN GREGORY.

On rule to show cause why certain moneys levied upon the execution in this case should not be returned to defendant.

1. The rule of law is settled, that extending to the principal further time of payment, will discharge the surety, unless there be evidence of assent by the surety to such extension.

2. The surety is not discharged if there be evidence of tacit assent on his part; But it is matter of defence, and generally speaking, can only avail the surety when set up as a bar to a recovery against him. Cases founded upon bail and replevin bonds and recognizances of bail, from their peculiar character, form an exception to the general rule.

3. Courts will not interfere in a summary way and relieve the surety after judgment and execution against him, by ordering moneys collected under execution to be returned to him, on the ground, that the plaintiff has extended time of payment of execution against the principal.

*P. D. Vroom* in support of rule.

*I. H. Williamson,* contra.

WHITEHEAD, J. The application is made upon the following state of facts. At the May term of this court, 1839, Gregory obtained judgment against John W. Cortelyou as maker of two promissory notes amounting to one thousand four hundred and seventy-three dollars. At the same term, the plaintiff obtained judgment against the defendant Solomon, as the indorser of one of the notes amounting to nine hundred and sixty dollars. Upon these judgments, executions were issued; against Cortelyou, to the Sheriff of Middlesex, and against Solomon, to the Sheriff of Somerset. By virtue of these executions, the sheriff of Somerset levied upon the real and personal property of Solomon, and the sheriff of Middlesex upon Cortelyou's goods in his store, amounting to five or six hundred dollars; took possession of them and closed the store. Mr. Cortelyou being out of employment, applied to his friends who advised him to get up a subscription to relieve him from his embarrassments, which he did. The subscription paper is as follows: " We the subscribers, having understood the situation in which our brother John W. Cortelyou is now placed, in consequence of an execution against his goods and chattels, for the sum of fifteen hundred dollars, which money he has expended in erecting the 2d Presbyterian church in

this place; now in order to relieve him from his embarrassed situation, we do hereby agree to pay or cause to be paid in six and nine months, to Mr. Gregory or some one appointed by him to make the arrangement in his behalf, the sum set opposite to our respective names, provided the said sum of fifteen hundred dollars be subscribed, so as to satisfy said Gregory and relieve Mr. Cortelyou from his present situation.

Then follow the subscribers' names and the sums opposite to each; and among them is the name of Mr. Solomon for the sum of one hundred dollars, payable according to the terms of the subscription. The whole amount of fifteen hundred dollars was not subscribed.

We are not furnished with the date of this paper, but as the subscribers' notes bear date 12th August, 1839, it is to be presumed it bore date on or before that day.

On the 19th August, 1839, Samuel Cassedy Esq. the attorney of Gregory, addressed a letter to the sheriff of Middlesex; in which he states, " Mr. Gregory requests me to say to you, that the affairs of Mr. Cortelyou are in such a train of settlement, as he doubts not will end in a final one; on the faith that Mr. Cortelyou will not dispose of his property, Mr. G. requests that you should give Mr. Cortelyou possession of his store, and let him go on with his business. We will know in a few days whether the settlement be complete. If not, I will write you to take possession again."

On the 10th September, 1839, Mr. Cassedy wrote to the attorney of Cortelyou, that Mr. Gregory had acceded to the terms of settlement proposed by Mr. Cortelyou.

We have before us a statement of the subscription notes passed by Mr. Cortelyou to D. S. Gregory the plaintiff's agent, amounting to twelve hundred dollars, on which is a calculation of the amount due on the judgment, and after deducting the amount of notes, leaves a balance of four hundred and ten dollars and forty cents. For this sum, the agent took Mr. Cortelyou's note at sixty days with interest. There is indorsed upon the statement, the following receipt, dated January 4th, 1840, and signed by D. S. Gregory the plaintiff's agent: " I have received the notes referred to on the other side, for collection; and if they are paid at maturity, am to apply to a discharge in full of

a judgment obtained by Benjamin Gregory against John W. Cortelyou, of fifteen hundred and fifty-eight dollars and ninety-eight cents; proceedings in the meantime, to be stopped." This paper is marked, exhibit 5.

By the deposition of Mr. Cortelyou, it appears, that after the subscription paper had been in circulation, and all that could be, was raised on it, he went down and saw D. S. Gregory, the agent of the plaintiff; delivered to him the notes mentioned in exhibit 5, who gave him a receipt for the same as thereon indorsed. That his own note of four hundred and ten dollars and forty cents, and the notes of some others on the subscription paper, were not paid. The total amount realized on the notes passed to the plaintiff, was six hundred and fifty-five dollars, besides which, he paid in cash, on the execution against him, three hundred and fifty-five dollars, which was realized from his goods formerly levied on by the sheriff. That when he gave the note for four hundred and ten dollars and forty cents, he expected it would be met at maturity by further subscription, in which he was disappointed. "That the defendant knew of the foregoing transaction in its progress, and it being concluded, he showed him the paper exhibit 5, and that he appeared satisfied." He further states, that he informed Mr. Gregory when he gave the note of four hundred and ten dollars and forty cents, he would not be able to meet it at maturity, but must depend upon the efforts of the friends of the church. All the other notes given by him to Gregory, were given with the same expectation. "That it was the understanding upon giving said notes, that he was to be put in possession of his store to go on with his business, and the possession was given a few days after the arrangement with Gregory."

It further appears in evidence, that although the terms of the subscription were not complied with, inasmuch as the whole sum of fifteen hundred dollars was not subscribed, yet Mr. Solomon paid the amount of his subscription. Mr. Gregory failing to realize the amount of the notes, directed the sheriff of Somerset, to raise the balance on the execution against the defendant Solomon, which has been paid into court, and he now applies under the above state of facts, to have the same returned to him, on the ground, that being only surety on the note, he was not, nor was

his property liable for the payment of it, as the plaintiff gave time to Mr. Cortelyou the principal, and took from him new securities for the payment of the judgment.

A question has been raised, whether the court can, under the circumstances of this case, entertain the application and grant the relief prayed for. I think not. I can find no precedent for this proceeding, and am not willing to assume jurisdiction and settle the rights of these parties, in this summary way.

The rule of law is well settled, that extending to the principal, further time of payment, will discharge the surety unless there be evidence of assent by the surety, to such extension, 2 *Brown Ch. Cases,* 579 ; 2 *Vesey jr.* 540 ; 3 *Merivale,* 272 ; 10 *Peters,* 257. The surety is not discharged if there be evidence of tacit assent on his part. 3 *Bosanquet and Puller* 363. Without such assent, it constitutes a good defence at law in an action against the surety. But it is matter of defence, and generally speaking, can only avail the surety, when set up as a bar to a recovery against him. There is a class of cases founded upon bail and replevin bonds and recognizances of bail, where the court upon special application, supported by affidavits, interferes in a summary way to prevent an improper use being made of its own records, or of the security which the party has been required to give. These from their peculiar character, form an exception to the general rule. I can find however, no authority even in these cases, for the interference of the court in this summary way, after judgment. The original securities being merged in the judgment, and the liabilities of the parties thereby fixed, we have no authority to order the moneys levied upon the execution against this defendant, to be returned to him, even if the facts disclosed in the evidence would have constituted a bar to a recovery against him, if pleaded or set up in the original action. But if there were no legal difficulty in the way, and we were authorized to look into the case, and afford the defendant relief, if entitled to it, still there is not enough disclosed in the case, to authorize these moneys to be returned to him, as there is abundant evidence of knowledge and assent on his part to all the arrangements between Mr. Cortelyou and the plaintiff's agent.

It is not pretended, that there has been any fraud practiced by any of these parties ; on the contrary, the arrangements were

all made in good faith and with a sincere desire to relieve Mr. Cortelyou. The debt for which the notes were given, was properly the debt of the board of trustees of which he was President. This fact was known to the parties, and hence their interest for him in his misfortunes. The defendant Solomon was willing to contribute of his own means, to relieve him. The plaintiff's agent was willing to defer the collection of his executions, in order that Mr. Cortelyou and the friends of the church might have time to perfect their arrangements for the ultimate payment, as they then expected, of the plaintiff's demand.

By referring to the evidence, it will be observed, that the friends of the church were not aroused, nor their sympathies excited for Mr. Cortelyou, until the sheriff took possession of his goods and closed his store. Being out of employment, his friends advised him to get up a subscription. For what purpose? To relieve him from the situation in which he was then placed in consequence of the execution against his goods and chattels, as well as to satisfy the plaintiff's demand against him. One object of his friends manifestly was to restore him to the possession of his goods, that he might go on with his business. For this purpose, Mr. Solomon, one of his friends, subscribed one hundred dollars. This subscription paper must have been executed on or before the 12th August, 1839, for on that day the subscribers gave their notes. Until this time, there is no evidence, that the plaintiff or his agent had been seen or consulted by Mr. Cortelyou or his friends. On the 19th August, seven days after the date of the subscribers' notes, the plaintiff's attorney wrote to the sheriff, that "*Mr. Cortelyou's affairs were in such a train of settlement, as Mr. G. thought would end in a final one,*" and directs the sheriff to give Mr. C. possession of his store, and let him go on with his business. Here the object of Mr. Solomon and the other friends of Mr. C. was accomplished. He had the possession of his store, and was enabled to go on with his business. In confirmation of this, is the testimony of Mr. Cortelyou, who says, "*it was the understanding upon giving said notes, that he was to be put in possession of his store to go on with his business, and the possession was given him a few days after the arrangement with Gregory.* But it is said, that if Solomon did agree, that possession of the store should be given to Mr. Cor-

telyou, it must have been upon the supposition and belief, that the settlement with Gregory was to be a complete settlement, and he exonerated.

I cannot find in the affidavit of Mr. Cortelyou, or in the other documents, any evidence of a settlement, other than that contained in the receipt and statement of 4th January, 1840, marked exhibit 5, wherein the amount then due is ascertained, and the plaintiff's agent acknowledges the receipt of notes for collection, and when collected were to be applied in discharge of the judgment. This was probably the conclusion or consummation of an arrangement, or settlement if it may be so called, which had been entered into by the parties some months before, and is referred to by Mr. Cassedy in his letter of the 10th September, 1839, wherein he says, "*Mr. Gregory has acceded to the terms proposed by Mr. Cortelyou.*" At all events, there is no evidence of another and different arrangement between the parties. When the receipt of 4th January, 1840, was delivered to Mr. Cortelyou, he made no complaint, that the terms varied from the previous understanding of the parties. He did not pretend, that Mr. Gregory was bound in any respect to receive the notes in full of the judgment. And did not Mr. Solomon know all this? Mr. Cortelyou swears, "*that he knew of the transaction in its progress, and it being concluded, he showed him the paper exhibit 5, and that he appeared satisfied.*" The evidence to my mind, is clear and decisive, that Mr. Solomon had knowledge and assented to all these arrangements.

Let the rule to show cause be discharged, and the money paid to the plaintiff in execution.

HORNBLOWER, C. J. and NEVIUS, J., concurred.

ELMER, J. did not hear the argument, and gave no opinion.

WHITE, J. It appears by the case, that John W. Cortelyou being indebted to Gregory, gave to him two promissory notes, amounting to fourteen hundred and seventy-three dollars; on those notes or on one of them, Solomon was the indorser, which was for nine hundred and sixty dollars.

In May term, 1839, Gregory obtained judgment against Cortelyou on both notes, to the amount of fourteen hundred and se-

venty-three dollars; and at the same time, he also got judgment against Solomon, as the indorser on one note for

Executions were issued on both judgments; one against Cortelyou, into the county of Middlesex, and one against Solomon, into the county of Somerset, and was by the sheriff of that county, levied on the real and personal estate of Solomon: on this execution the money has been made of the property levied on, and was paid by the sheriff into court; and the present application is by the defendant Solomon, to have that money restored to him.

The sheriff of Middlesex, by virtue of the execution in his hands against Cortelyou, at the suit of Gregory, with other property of the defendant in execution, levied on a store of goods, worth between five hundred and six hundred dollars; and the sheriff closed the store.

Those executions were returnable to this court in the term of September, A. D. 1839.

After this proceeding, and before the execution against the principal debtor, or that against Solomon the indorser, were returned; Mr. Cortelyou, to relieve himself and his surety, from the pressure, through the aid of friends, obtained a subscription, by which the sum of twelve hundred dollars was agreed to be paid by sundry persons, in part satisfaction of the judgment and execution of Gregory against Cortelyou. On this subscription, the sum of one hundred dollars was subscribed by Solomon the surety; and Mr. Gregory himself agreed to abate a small sum: but after deducting the amount subscribed &c. from the amount due on the execution, there was still a balance of four hundred and ten dollars and forty cents, for which Mr. Cortelyou gave to Mr. Gregory or to his agent, his own note payable at sixty days, with interest.

After this subscription paper was obtained, Cortelyou took it to Mr. D S. Gregory, the agent of the plaintiff, and delivered to him the notes mentioned in exhibit 5, and obtained a receipt for the same, at the foot of the statement then made, in these words: " I have received the notes referred to on the other side, for collection; and if they are paid at maturity, am to apply to the discharge in full of a judgment obtained by Benjamin Gregory against John W. Cortelyou, of fifteen hundred and fifty-six

dollars and ninety cents; proceedings in the meantime are to be stopped. Dated, Jersey City, January 4th, 1840. D. S. Gregory.

On the 19th of August, 1839, Samuel Cassedy, the attorney of Benjamin Gregory, wrote to the sheriff of Middlesex, as follows: "Mr. Gregory requests me to say to you, that the affairs of Mr. Cortelyou are in such a train of settlement, as he doubts not, will end in a final one. On the faith and confidence, that Mr. Cortelyou will not dispose of his property, Mr. Gregory requests that you should give Mr. Cortelyou *possession of his store, and let him go on with his business.* We shall know in a few days, whether the settlement be complete, and if not, I will write you to take possession. Yours, Samuel Cassedy, attorney."

On the 10th day of September, 1839, Samuel Cassedy, the attorney of Mr. Gregory, by letter informed Mr. Blauvelt, that Mr. Gregory had acceded to the terms of settlement proposed by Mr. Cortelyou; that there was yet something to be done by Mr. Cortelyou; then speaks of the sympathetic feeling in his favor, in consequence of his honorable conduct, and concludes by saying, that if he, Cortelyou had secreted any of his property, or confessed a judgment to another, they would have done nothing; and requests Mr. B. to urge Mr. Cortelyou to come and finish the matter.

The matter now submitted to this court, is exclusively a case between a principal creditor and one who was only surety, or in other words, an indorser for a debtor.

It is not now a question, whether by the transaction between Gregory and Cortelyou the debtor, the debt of Cortelyou has been paid; or that Cortelyou is discharged from the judgment and execution of Gregory against him. But has the surety of Cortelyou been by act of the creditor, relieved from his responsibility? Has there been time and indulgence given to the principal debtor, which may have operated to the disadvantage or injury of the surety, and that without his knowledge or assent, or any acquiescence, from which his assent can be inferred?

A surety who receives no consideration for his liability, is entitled to much consideration; and the creditor who has obtained his responsibility, is in law and equity, bound not to increase his risk or to diminish his security without his consent.

At the time the execution was levied on the estate of the defendant Solomon, another execution at the suit of Gregory the creditor, was levied on a store of goods, the property of, and in possession of Cortelyou, the principal debtor: and every principle of law and fair conduct required, that the goods of the principal debtor, thus in the custody of the law, should be first applied to the payment of the execution, before the surety should be called upon to pay ; and though after judgment and execution, the creditor was not strictly bound to direct the order of sale, yet he was bound not to forego or release any security which was thus obtained for the satisfaction of his execution first out of the estate of his principal debtor.  The sheriff had levied on the store of goods, said to be worth at that time, five hundred or six hundred dollars; they may have been worth at that time more. The creditor and not the surety, had the whole control of this fund.  Mr. Solomon could not then interfere with the sheriff, or call for an inventory of the goods.  Those goods were afterwards by the assent and direction of Mr. Gregory, released from the lien he had on them, and were given up to the defendant Cortelyou, to be disposed of as he thought proper ; he did again take the possession of his store and goods, and disposed of the goods all or part.

What they were really worth or how much money was obtained by Mr. Cortelyou for them, does not appear : nor do I think it of any importance 'in this case, as I view it, what Cortelyou realized out of the sale.  The evidence shows, that only three hundred and thirty-five dollars of the proceeds of all the goods levied upon, were applied to the discharge of the execution which was levied upon them.  Whether the diminution was occasioned by waste, mismanagement or diminution in value, does not appear.  It is evident there was a loss on the goods, and an increase of interest and cost by the delay occasioned by the consent of the plaintiff.

In the case of *Capel* v. *Butler*, 2 *Sim. and Stu.* 457, it is said, that if by the neglect of the creditor, the benefit of some of the securities for the debt are lost, the surety is *pro tanto* discharged.  *Harr. Dig. Tit. Surety.*

If obligee in bond with surety, without communication with

the surety, takes notes from the principal debtor and gives further time, the surety is discharged. 2 *Ves. Jr.* 540.

If the creditor, by the direction of the surety, sues the principal, but without the privity of surety, agrees to stay execution, the surety is discharged. *Ib.*

Where a creditor having already a warrant of attorney from his debtor, takes a promissory note from him and surety; and afterwards enters up judgment under his warrant of attorney, and takes the goods of the principal debtor in execution, and subsequently withdraws the execution, without the knowledge of the surety; he thereby discharges the surety. *Harr. Dig. Tit. Surety;* 2 *Wil's. C. C.* 4:8, *Mayhew* v. *Crickets.*

Giving time by a valid and binding agreement, by creditor to debtor, without the assent of surety, operates to discharge him, both at law and equity; not only whether any loss has thereby happened to him or not; but even if it has been an actual benefit. *Vide. Gahor* v. *Niemcewicx,* 11 *Wend.* 312; 3 *Johns. Dig.* 519.

Where the nature of legal proceedings affords an opportunity of presenting the question; the same rule as to what will discharge the surety, prevails as well at law as in Equity. *The People* v. *Johnson,* 7 *Johns. Rep.* 332; *Vid.* 17 *Johns. Rep.* 384. Opinion of Chief Justice Spencer; 1 & 2 *Johns. Dig.* 321.

By the state of the case it appears, that Solomon, sympathizing with Cortelyou, as the other members of the church did, became a party to the subscription, and did himself subscribe one hundred dollars, and assumed the payment thereof to Mr. Gregory the plaintiff; he had also an interest in this, he expected no doubt, that by the operation of that subscription, to be relieved from all his liability as indorser. The principal debtor as well as the surety, were disappointed in this. Their expectations were not realized; the whole amount subscribed not being paid in, left a considerable sum of the original debt unsatisfied, and still due on the judgment and execution against Cortelyou; and the execution against Solomon still remaining in the hands of the sheriff; on it the sum of    was made and paid into this court, and should be paid over to the plaintiff if he has done no act to exonerate Solomon the surety of Cortelyou.

What did he do? He received other securities from his original debtor. He gave time; but this would not discharge Solo-

mon. What did he do further? After the execution against Solomon was levied on his goods; he, by his agent or attorney directed the sheriff to release the store goods, or rather to permit the defendant Cortelyou, to take possession of his store, and make use of or sell the goods taken in execution. This was, I apprehend, interfering with the security which he had a right to rely on as his indemnity. The surety could not control this proceeding; he could not seize on the goods or prosecute the man for whom he was bound. The loss of the goods was at the risk of the surety. The amount of debt, interest and costs were increasing and adding to the amount of his liability.

The inquiry then is, did he consent, or had he such notice of the fact, that the goods were to be given up, as that his assent to the measure can be implied?

What notice had he? The levy on the goods of Cortelyou, under the execution against him, was made in 1839, and the execution returned to September 1839. Before the return of the writ, and before the plaintiff or any other person interested, could look to the proceedings of the sheriff, to see if a full and true inventory of all the estate of the principal debtor was made, the creditor, from the best of motives no doubt, with all the sympathy which others felt for Mr. Cortelyou, agreed to give up the store goods to the debtor. This without consulting Mr. Solomon or getting his assent to the measure. This appears to have been done as early as 19th or 20th of August, 1839, in pursuance of a letter from Samuel Cassedy Esq. the attorney of the plaintiff, to Brown the sheriff of Middlesex. What was the amount of the whole property of Mr. Cortelyou, which was levied upon, does not appear. The store goods are said to be of the value of five hundred or six hundred dollars. They may have been all converted into money for the use of Mr. Cortelyou, and the three hundred and thirty-five dollars paid by him, in part of the execution, though raised from the sale of goods levied on under the execution against him, may have been the proceeds of other goods of the defendant. I think the defendant Solomon, if the plaintiff Gregory, had not interfered with the execution of the writ in the hands of the sheriff against Cortelyou, would have been entitled to have inquired into the proceedings. But if the plaintiff released his debt or gave up to the principal debtor,

any of the goods levied on, the surety could not interfere with the defendant in that stage of the business, or call on the sheriff to see his return, or insist that he should make a true and perfect inventory of the goods of Cortelyou. If this would be granted to him, and by the act of the creditor in stopping the execution and relinquishing the lien he has obtained by the levy ; should it not exonerate the surety, at least pro tanto ? I think it should, if done against his will or without his assent.

The remaining question is, did Solomon know of this proceeding? Had he such knowledge as that his assent can be implied, to the relinquishment of the execution lien on the personal property of Cortelyou? All the information he had, was from Mr. Cortelyou, and the fact that he subscribed one hundred dollars on the subscription list, and that the money raised from that subscription was to relieve Cortelyou. That Cortelyou had given his own note to the plaintiff for four hundred and ten dollars and forty cents, to make up the full sum due Gregory, and that Mr. Cortelyou very honestly told Gregory of his prospects or expectations of being able to meet the payment of that note at maturity : those are the matters which Mr. Cortelyou in his affidavit says Solomon had notice, and after the whole was concluded, he says he showed to Solomon, exhibit No. 5, and he appeared to be satisfied ; but, I cannot find in the evidence, that it was stated to Solomon, that the goods levied upon were to be given up, and he to remain liable for any deficiency that might be. Cortelyou does, to be sure, say it was the expectation or understanding upon giving the notes of the subscribers, to Gregory, that he was to be put in possession of his store, to go on with his business ; but in no part of his evidence does he say, that Solomon was a party to this agreement, or so understood it : or that he knew of the whole agreement, until he was shown the statement marked No. 5, which was more than five months after the debtor had been put in possession of his store goods.

From the view I have taken of the evidence in this case, I am of opinion that the interference of the plaintiff with the execution and levy made on the goods of the original debtor, discharged the surety from his liability ; and that the money made on the execution against him, after such discharge, should be restored to him. *Rule discharged.*

CITED *in Mor. Can. and B'kg Co.* v. *Van Vorst,* 1 *Zab.* 121.